IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:19-cr-171 |
| | ) | |
| ROBERT JAMES McCABE | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S TRIAL MEMORANDUM
AND NOTICE OF INTENT TO INTRODUCE RES GESTAE
AND EVIDENCE OF OTHER ACTS PURSUANT TO RULE 404(b)

The United States, by and through its attorneys, Raj Parekh, Acting United States

Attorney for the Eastern District of Virginia, and Melissa E. O'Boyle, Randy Stoker, and

Anthony Mozzi, Assistant United States Attorneys, hereby submits its trial brief and provides

notice to defendant Robert James McCabe of the government's intent to introduce evidence at

trial of the defendant's other acts pursuant to res gestae, as well as pursuant to Federal Rule of

Evidence 414 and Federal Rule of Evidence 404(b) in order to prove his intent, knowledge,

modus operandi, and absence of mistake or accident in reference to the offenses charged in the

Indictment

## I.      Charges in the Indictment

On October 24, 2019 a grand jury sitting in Norfolk returned an indictment against

defendant Robert James McCabe ("McCabe") charging him with various crimes relating to his

efforts to profit from his position as the Sheriff of Norfolk. The indictment charges McCabe with

two counts of Conspiracy to Commit Honest Services Mail Fraud, in violation of 18 U.S.C. §

1349 (Counts 1-2), five counts of Honest Services Mail Fraud, in violation of 18 U.S.C. §§ 1342,

2 (Counts 3-7), two counts of Conspiracy to Obtain Property Under Color of Official Right, in violation of 18 U.S.C. § 1951 (Counts 8-9), one count of Obtaining Property Under Color of Official Right, in violation of 18 U.S.C. § 1951 (Count 10), and one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h) (Count 11). Id.

As alleged in the indictment, as Sheriff, McCabe was charged with the custody, feeding, and care of all prisoners confined in the Norfolk City Jail. ECF No. 1 ¶2. McCabe used his position, which provided him significant discretion over contracts concerning the jail, to enrich himself by soliciting things of value from Conspirator #1, an executive of Company A which provided food services to the Norfolk Jail, and defendant Gerard Francis Boyle[1], an executive with Correct Case Solutions ("CCS"), which provided healthcare to inmates. ECF No. 1 ¶7. In exchange, McCabe took care to ensure that both Company A and CCS had an inside advantage in the competitive bidding process for providing services to the Norfolk Jail, and later exercised discretion provided to the Sheriff alone to: (1) unilaterally extend existing contracts to allow Company A and CCS to entirely avoid the competitive bidding process, and (2) change the existing contracts' terms to financially benefit both companies.

More particularly, Counts One and Two of the indictment charge McCabe with conspiracy to commit honest-services mail fraud. Count One alleges that from about 1994 through December 2016, McCabe and Conspirator #1 agreed to execute a scheme to defraud the citizens of Norfolk of their right to McCabe's honest services through bribery, thereby violating 18 U.S.C. § 1349. The gravamen of Count One is that McCabe solicited and received free catering for numerous campaign events including, but not limited to, his golf tournament, travel, substantial campaign donations, entertainment, hundreds of dollars of gift cards, and other

---

[1] Defendant Gerard Francis Boyle was also charged in the same indictment, but the Court granted Boyle's motion to sever, *see* ECF No. 54, and his trial is currently scheduled to begin on October 26, 2021.

personal gifts from Conspirator #1.  ECF No. 1 ¶13.  In return, McCabe provided Conspirator #1 with inside information during the competitive process by showing him bid proposals submitted by other companies who responded to the city's request for proposals ("RFP"), which allowed Conspirator #1 to submit an updated proposal for Company A with a lower price to undercut the other bidders.  ECF No. 1 ¶10.  McCabe also granted extensions to Company A's food services contracts without putting the contracts out to bid, ECF No. 1 ¶13, and granted Company A cost of living ("COLA") increases.  McCabe and Conspirator #1 used the mail and/or private interstate carriers to send payments to Company A, and McCabe took steps to conceal the things of value he received, including by omitting the gifts from mandatory Statement of Economic Interests and failing to list in-kind political donations in his Campaign Finance Reports.

Count Two of the indictment similarly alleges that, from about January 2004 through December 2016, McCabe and defendant Boyle conspired with each other and with other persons to commit honest-services mail fraud.  McCabe received cash, a loan, entertainment—including attendance at the "Richard Petty Driving Experience" and concerts—as well as travel-related expenses, campaign contributions, undisclosed in-kind political donations such as all-expense paid trips to Nashville, engraved cigars, a guitar autographed by Alan Jackson, and other personal gifts.  McCabe, in exchange, directed employees to disclose confidential RFP bidding information to defendant Boyle and other CCS employees, repeatedly exercised options to extend CCS's contract beyond its original term to prevent CCS from having to compete with other companies for the city's business, and awarded contract adjustments that finically benefitted CCS. Again, McCabe and defendant Boyle used the mails and/or private and commercial interstate carriers to facilitate payments to CCS, and McCabe also acted to conceal

his bribery relationship including falsifying expenditures in his Campaign Finance Report, including recruiting others to act as straw donors.

Counts Three and Four charge McCabe with substantive counts of honest services wire fraud specifically relating to two checks sent to Conspirator #1's company—a March 18, 2016 check for $18,290.28 and an April 6, 2016 check for approximately $18,317.00—as a result of McCabe's *quid pro quo* relationship with Conspirator #1 in violation of 18 U.S.C. § 1343. Counts Five through Seven similarly concerns specific checks sent to CCS, including a December 23, 2015 check for approximately $321,754.54, an April 20, 2016 check for approximately $321,754.54, and an April 25, 2016 check for approximately $321,754.54.

Counts Eight, Nine, and Ten charge the McCabe conspired to, and did, violate the Hobbs Act by unlawfully interfering with commerce by committing extortion—*i.e.*, "the obtaining of property from another, with his consent . . . under color of official right."  18 U.S.C. § 1951(a), (b)(2).  Specifically, Counts Eight and Nine alleges that McCabe knowingly and intentionally conspired with Conspirator #1 and defendant Boyle, respectively, to obtain property not due to him or his office.  Count Ten alleges that McCabe committed Hobbs Act extortion by obtaining cash, loans, campaign donations, and various other gifts and other things of value not due to him or his office.

Lastly, Count Eleven of the indictment alleges that McCabe, defendant Boyle, and Conspirator #2 conspired to launder money in violation of 18 U.S.C. § 1956(a)(1)(B)(i) by, among other acts, using straw donors to obscure campaign donations.  According to the indictment, defendant Boyle signed and gave to McCabe a $12,500 check which Boyle falsely wrote was for "consulting" and which left the "payee" field completely blank.  ECF No. 1 ¶48. McCabe then gave this check to Conspirator #2 who deposited it and then directed several

friends, and two companies that he controlled, to give donations to McCabe's mayoral campaign which Conspirator #2 would later repay.  ECF No. 1 ¶¶49-51.

## II.     Law Governing This Case

### A.  Law Governing The Charges

Counts Three through Seven charge McCabe with honest-services mail fraud, in violation of 18 U.S.C. § 1341. Counts One and Two charge him with conspiracy to commit that offense, in violation of 18 U.S.C. § 1349.[2] To commit the substantive offense of honest-services mail fraud, the government must prove that: (1) a defendant knowingly devised or participated in a scheme to defraud the public of its right to the honest services of a public official through bribery, and (2) in advancing, furthering, or carrying out the scheme to defraud, the defendant misused the mails. *See United States v. Pinson*, 860 F.3d 152, 168 (4th Cir. 2017) (citing *Skilling v. United States*, 561 U.S. 358, 368 (2010)); *United States v. Wynn*, 684 F.3d 473, 477–78 (4th Cir. 2012).[3] A conspiracy to commit mail fraud has two elements: "(1) that two or more persons agreed to commit [mail] fraud; and (2) that at some time during the conspiracy, the defendant had knowledge of the criminal objective of the agreement and willfully joined the conspiracy with the intent to further its unlawful purpose." *United States v. Vinson*, 852 F.3d 333, 351 (4th Cir. 2017).

Count Ten of the indictment charges McCabe with Hobbs Act extortion under color of official right, in violation of 18 U.S.C. § 1951, while Counts 8–9 charge McCabe and Boyle with

---

[2] In accordance with the Court's Order, the government will submit its draft jury instructions to the Court on July 27, 2021.

[3] To convict, the jury must also find that the defendants acted with intent to defraud and that the scheme or artifice to defraud involved material misrepresentations or concealment, although the Fourth Circuit has not framed these as standalone elements of the offense. *See United States v. Brandon*, 298 F.3d 307, 311 (4th Cir. 2002); *United States v. Colton*, 231 F.3d 890, 898 (4th Cir. 2000); *see also* Kevin F. O'Malley, et al., 2A Fed. Jury Prac. & Instr. § 47:03 (6th ed. updated through Feb. 2020).

conspiracy to commit that offense. The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). To prove the substantive offense of extortion under color of official right, the government "need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *United States v. Ocasio*, 750 F.3d 399, 409 (4th Cir. 2014), *aff'd,* 136 S. Ct. 1423 (2016) (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)). Thus, Hobbs Act extortion under color of official right is "the rough equivalent of ... taking a bribe." *Evans*, 504 U.S. at 260 (internal quotation marks omitted). To prove a Hobbs Act conspiracy, the government need only show that the defendants agreed to commit acts which, if performed, would have satisfied the elements of the substantive offense. *United States v. Buffey*, 899 F.2d 1402, 1403 (4th Cir. 1990); *see also Ocasio*, 136 S. Ct. at 1429 ("[A] defendant may be convicted of conspiring to violate the Hobbs Act based on proof that he entered into a conspiracy that had as its objective the obtaining of property from another conspirator with his consent and under color of official right."). No proof of an overt act is required. *Ocasio*, 750 F.3d at 410 n.12.

Count Eleven charges McCabe with conspiracy to commit money laundering, in violation of 18 U.S.C. 1956(h).  To prove a conspiracy to commit money laundering, the government must prove that "(1) an agreement to commit money laundering existed between [two] or more persons; (2) the defendant knew that the money laundering proceeds had been derived from illegal activity; and (3) the defendant knowingly and voluntarily became a part of the conspiracy." *United States v. Singh*, 518 F.3d 236, 248–49 (4th Cir. 2008) (citing *United States v. Alerre*, 430 F.3d 681, 693–94 (4th Cir. 2005)). It is not necessary to prove that money was

actually laundered, nor is it necessary to prove that an overt act was committed in furtherance of the conspiracy. *Alerre*, 430 F.3d at 693–94.

### B.  Law Applicable to Bribery Offenses

To prove the bribery offenses against McCabe, the government must establish that he "committed or agreed to commit an 'official act' in exchange for" a thing of value. *McDonnell v. United States*, 136 S. Ct. 2355, 2365 (2016).  In other words, the federal bribery laws "prohibit[] quid pro quo corruption—the exchange of a thing of value for an 'official act.'" *Id.* at 2372.  The type of proof varies depending on the nature of the thing of value.  In a personal-benefit case, the illicit agreement between bribe recipient and bribe payor "need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain." *Id.* at 2371.  In a campaign-contribution case, by contrast, the agreement must involve "an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick v. United States*, 500 U.S. 257, 273 (1991).  "Explicit" in this context simply means that the agreement must relate to a "specific requested exercise of … official power." *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) (quoting *Evans*, 504 U.S. at 258). So long as the agreement is "clear and unambiguous," *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992), it satisfies the explicitness requirement of *McCormick*.  Here, the indictment alleges that McCabe solicited and received both personal benefits as well as campaign contributions from the payors.

Under the federal bribery statute, an "official act" is "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). *McDonnell* elaborated on this

definition in two important ways. First, the government "must identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." *McDonnell*, 136 S. Ct. at 2368 (quoting 18 U.S.C. § 201(a)(3)). Those terms "connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *Id.* at 2369. That is, they refer to "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* To be pending or potentially brought by law before a public official, a question or matter must be "focused" and "concrete." *Id.*; *see also id.* at 2372 (describing a qualifying matter as "something specific and focused"). Because the federal bribery statute uses the phrase "which may at any time be pending, or which may by law be brought before any public official," 18 U.S.C. § 201(a)(3), the matter need not be pending before the public official who is performing the official act. Thus, the official involved in the bribery scheme need not have ultimate control over the outcome of the question or matter. Instead, "the matter may be pending either before the public official who is performing the official act, or before another public official." *McDonnell*, 136 S. Ct. at 2369.

Second, the government must show that the public official "made a decision or took an action" on the question or matter. *Id.* at 2368. While merely "hosting an event, meeting with other officials, or speaking with interested parties" does not, standing alone, meet this requirement, more overt advocacy can. *Id.* at 2370. For example, McDonnell clarifies that using an official position "to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act,'" qualifies as an official act under the federal bribery statute. *Id.* at 2372. Additionally, the official act need not be the final decision on the question or matter. Rather, it can be "a

qualifying step, such as narrowing down [a] list of potential research topics" for an official government study.  *Id.* at 2370.

Applying these standards, courts have easily concluded that decisions on procurement matters—including both final decisions and "qualifying steps"—are official acts under *McDonnell*.  The Fourth Circuit has twice held as much.  *See United States v. Pinson*, 860 F.3d 152, 168 (4th Cir. 2017) ("Givens's signing of the contract qualifies as an 'official act,' even under the more restrictive definition that [McDonnell] recently adopted when interpreting the term in a separate bribery statute."); *United States v. Conrad*, 760 F. App'x 199, 209 (4th Cir. 2019) (rejecting the assertion "that facilitating the award of government contracts—and then maintaining those contracts—is not a decision or action 'on' a question or matter" (citing *United States v. Repak*, 852 F.3d 230, 254 (3d Cir. 2017))).  Other courts are in accord.  *See Cordaro v. United States*, 933 F.3d 232, 242 (3d Cir. 2019) ("Entering into contracts is 'a formal exercise of governmental power' that falls 'within the specific duties of an official's position.'" (quoting McDonnell, 136 S. Ct. at 2369)); *United States v. Spellissy*, 710 F. App'x 392, 395 (11th Cir. 2017) ("[C]onduct that involved the awarding of specific government contracts up for bid … still meets the definition of 'official act' after *McDonnell*."); *United States v. Skelos*, 707 F. App'x 733, 739 (2d Cir. 2017) ("Using one's influence as a high ranking state official to push through county legislation and to bestow a county-issued contract are indisputably formal exercises of governmental power constituting official acts under *McDonnell*."); *Miserendino v. United States*, 307 F. Supp. 3d 480, 490 (E.D. Va. 2018) (concluding "that the awarding of contracts, subcontracts, and task orders" was an official act under *McDonnell*).

The government is not required to prove an exact one-to-one relationship between each thing of value and each official act.  Instead, courts have long recognized that bribery can arise

through a course of conduct wherein both the bribe payor and the bribe recipient understand that

things of value are being exchanged for official acts. Courts sometimes refer to this as the

"stream of benefits" or "as opportunities arise" method of committing bribery. These sorts of

quid pro quo relationships were unlawful before *McDonnell* and they remain illegal today. The

key case in this Circuit is *United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998).  There, the

Court expressly held that "[t]he quid pro quo requirement is satisfied so long as the evidence

shows a course of conduct of favors and gifts flowing to a public official in exchange for a

pattern of official actions favorable to the donor." *Id.* at 1014 (internal quotation marks omitted).

*Jennings* further clarified that "the government need not show that the defendant intended for his

payments to be tied to specific official acts." *Id.* The Fourth Circuit has continued to adhere to

Jennings in subsequent cases. *See United States v. Jefferson*, 674 F.3d 332, 359 (4th Cir. 2012),

as amended (Mar. 29, 2012) ("[I]t would be impossible—and it is unnecessary—to link every

dollar paid to one of the Jefferson family companies to a specific meeting, letter, trip, or other

action by Jefferson to fulfill his end of a corrupt bargain."); *United States v. Quinn*, 359 F.3d

666, 673 (4th Cir. 2004).

The Fourth Circuit's approach to stream-of-benefits bribery in *Jennings* has become the

consensus approach in the courts of appeals. *See, e.g.*, *United States v. McDonough*, 727 F.3d

143, 154 (1st Cir. 2014) (citing *Jennings*); *United States v. Terry*, 707 F.3d 607, 612

(6th Cir. 2014) ("The agreement between the public official and the person offering the bribe

need not spell out which payments control which particular official acts."); *United States v.

Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) ("Once the quid pro quo has been established, ... the

specific transactions comprising the illegal scheme need not match up this for that."); *United

States v. Ciavarella,* 716 F.3d 705, 730 (3d Cir. 2013) (proof of bribery "does not require that

each quid, or item of value, be linked to a specific quo, or official act" (quoting *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012), as amended (Feb. 7, 2012))); *United States v. Redzic*, 627 F.3d 683, 692 (8th Cir. 2011) ("[T]he government must present evidence of a quid pro quo, but an illegal bribe may be paid with the intent to influence a general course of conduct. It was not necessary for the government to link any particular payment to any particular action undertaken by [the defendant]." (citing *Jennings*)); *United States v. Whitfield*, 590 F.3d 325, 353 (5th Cir. 2009) (stating that "the overwhelming weight of authority from this court and our sister circuits supports the conclusion that the law does not require" a one-to-one linkage between payments and official acts (citing *Jennings*)); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009) (citing *Jennings*).

Finally, the government does not need to prove that that the defendants' quid pro quo arrangements were expressed aloud or in writing. Instead, "[s]uch an intent may be established by circumstantial evidence." *Jennings*, 160 F.3d at 1014 (citing *United States v. Massey*, 89 F.3d 1433, 1439 (11th Cir. 1996); *United States v. Biaggi*, 909 F.2d 662, 684 (2d Cir.1990)); *see also United States v. Hamilton*, 701 F.3d 404, 409 (4th Cir. 2012) (explaining that bribery-related intent "can be implied—and it is the jury's role to make such factual inferences" (citing *United States v. Engle*, 676 F.3d 405, 418 (4th Cir. 2012))).

## III.    Anticipated Trial Evidence

The trial in this matter is scheduled to begin on August 3, 2021. At trial, the government intends to call numerous witnesses who will detail the corrupt dealings between McCabe and Conspirator #1 as well as McCabe and defendant Boyle as well as others. The government will corroborate these witnesses' accounts with business records, expense reports, emails, text messages, bank records, and other documentary evidence. The evidence will establish that

McCabe engaged in a multi-year scheme to enrich himself by accepting bribes in exchange for official acts.

### A.  Anticipated Testimony Concerning Defendant Boyle and CCS

The government will introduce evidence concerning the gifts and other things of value received by McCabe from Boyle and how, in return, McCabe engaged in official acts that provided CCS with financial benefits by giving the company an inside advantage in the competitive bidding process, unilaterally modifying terms of the contract to CCS's advantage, and exercising discretion to extend the duration of existing contract to prevent other companies from submitting competing bids.

#### a.  2004 RFP and Subsequent Extensions

McCabe knew Boyle as early as 1997, when Boyle worked for another medical provider, Prison Health Systems ("PHS").  At the time, PHS held the contract to provide medical services for the Norfolk City Jail.  Boyle subsequently left PHS and went on to found CCS in 2004.  That same year, the contract with PHS to provide medical services to inmates at the Norfolk City Jail expired and the NSO submitted an RFP to obtain competing bids.  At the time, CCS only had one medical services contract, which was for the prison system in Kansas, and needed to secure additional business.  The government intends to introduce an email from a senior executive at CCS, in which he explained that Norfolk was "at the TOP of our wish list."

The government will introduce evidence proving that Boyle and another senior CCS executive began providing gifts to McCabe as early as January of 2004 at a conference in New Orleans where the two CCS executives paid for "entertainment expenses" for McCabe and other employees of the Norfolk Sheriff's office.  McCabe later thanked Boyle for his "hospitality," stating, "[y]ou and your staff certainly made it more enjoyable."

On March 12, 2004, Boyle made the first of many campaign contributions through McCabe's annual golf tournament.  Only four days later, on March 16, 2004, Norfolk issued Request for Proposal ("RFP") No. 2033 to companies seeking to provide comprehensive medical, dental and mental health services for inmates of the Norfolk City Jail.  The RFP, which the government will introduce at trial, contained numerous provisions governing ethics in public contracting including prohibitions on the giving and receiving of gifts.  The RFP also provided that "[d]iscussions with other City employees or officials during the solicitation and evaluation period are inappropriate.  Therefore, offerors shall not contact any other City employees or officials regarding this RFP during the period of solicitation and evaluation."

The government intends to present evidence that – on the day that potential bidders could tour the Norfolk City Jail – McCabe and Boyle met alone in his office.  Boyle later told a senior CCS employee about the meeting and stated his belief that they were in a good place with McCabe.  McCabe later sent an internal memo discussing upcoming CCS negotiations from his legal counsel from the fax machine in his house to CCS.  Days later, McCabe, Boyle, and others met to "negotiate" the terms of the contract at McCabe's home and later at Greenies, a bar in East Oceanview.  After these informal negotiations were completed and McCabe had selected CCS for the contract, Boyle arranged for McCabe and one of his top deputies to attend a charity benefit in Nashville, Tennessese featuring country music singers Brooks & Dunn.

On June 15, 2004, McCabe and Boyle executed the contract between the Norfolk Sherriff's office and CCS.  The government will also introduce correspondence between a senior CCS official and an NSO employee in which the two joke about taking the contract from PHS and discuss obtaining tickets to a Chicago Cubs game later in August.  The government also will

introduce a later expense report reflecting the purchase of two football tickets—on the 50-year line for a Redskins/Packers game—as a "thank you" to McCabe and another NSO deputy.

The government will introduce evidence showing that, once the contract was in place, McCabe engaged in numerous official acts that benefited CCS in exchange for donations, entertainment, and other gifts.  For example, on January 18, 2005, Sheriff McCabe sent a letter to the City Attorney's office requesting that the City of Norfolk waive a letter of credit requirement contained in the original contract and return $250,000 in held funds back to CCS.  The City of Norfolk received no concessions of any kind from CCS as a result of the unilateral decision to waive this contractual requirement imposed on CCS.  On August 21, 2006, McCabe signed an amendment extending the CCS contract, permitting CCS to sidestep the competitive RFP process.  A few months later, CCS paid for McCabe and Koceja to attend the Richard Petty Driving Experience, which allowed participants to drive at NASCAR race car.

Over the course of 2007 and 2008, McCabe and Boyle continued to engage in a *quid pro quo* relationship in which Boyle provided things of value and McCabe, in return, continued to extend CCS's contract and grant cost of living increases.  For example, the government intends to introduce an email from Boyle in October 2008 in which he asks two CCS investors for checks made out to "re-elect Robert McCabe Sheriff."  Boyle further states:

> Because you are a miracle workers the Sheriff has also stated that "it would be cool if Ronnie [Dunn] or Alan [Jackson] could write a check supporting my campaign".  Celebrity is everything for some people I guess.  That was his request and our contract is out to bid in January for a July renewal.  Let me know your thoughts and don't kill the messenger.

A few days later, McCabe sent an email to Boyle and the two CCS investors in which he thanks them for the political donations and refers to Boyle as his "southeast campaign chairman."

### b. 2010 RFP and Subsequent Extensions

On May 21, 2010, the City of Norfolk issued a new RFP for medial service at the Norfolk Jail.  The government will introduce that document as well as an email from a senior CCS executive  noting the ethical requirements contained therein, which specify that "[d]iscussion with other City employees or officials during the solicitation and evaluation period are inappropriate.  Therefore, vendors shall not contact any other City employees or officials regarding the RFP during the period of solicitation and evaluation."

On August 17, 2010, the bidders on the RFP were expected to provide their best and final offers ("BAFOs").  The government will introduce a spreadsheet containing BAFOs for all four companies that submitted a bid, which reflects that another company underbid CCS by over $150,000.  Rather than relying on the BAFOs, however, the Norfolk Sheriff's Office requested additional clarification of items contained in the RFP and allowed each competitor to re-submit a second BAFO.  When the second BAFOs were submitted, CCS's proposal had decreased by $205,000, purportedly because CCS had just renegotiated their workers compensation and malpractice insurance and had eliminated the medical records scanning service.  At trial, the government will introduce evidence that these reasons were false.  Because of the inexplicable $205,000 drop, CCS became the lowest bidder and McCabe ultimately awarded the contract to CCS.  On December 16, 2010, McCabe, in his official capacity as the Sheriff of Norfolk, executed the agreement between the NSO and CCS for the provision of medical services.  Two months later, McCabe solicited contributions from Boyle for his annual golf tournament and CCS contributed a check totaling $7,500.

On October 31, 2011, McCabe traveled with Boyle to a casino in Phoenix, Arizona.  The government intends to introduce bank statements and casino records showing that Boyle

withdrew thousands of dollars of cash before the trip and further obtained funds through a cash advance from one of his credit cards while at the casino.   The government will call one of McCabe's employees at the Norfolk Sheriff's Office who will testify that, after one of McCabe's gambling trips, the employee walked into McCabe's house and observed a stack of money on McCabe's desk.

### c. 2016 Mayoral Campaign

The government will introduce evidence showing that, at Boyle's request, several executives of CCS wrote personal checks to McCabe's campaign for mayor.  The nexus between the giving of campaign contributions and requests for official actions on behalf of the sheriff were well-entrenched at CCS.  On July 15, 2015, a senior CCS executive sent a text message stating:  "[h]eard McCabe announced he will run for mayor…Maybe an opening for our CPI discussion."  Over the next few months, Boyle personally donated approximately $3,000 to McCabe's mayoral campaign while CCS, and other CCS employees, donated thousands of dollars as well.   Then, on April 15, 2016, Boyle attended McCabe's annual golf tournament. During the tournament, Boyle wrote a personal check for $12,500, left the "to" line blank, signed the check and wrote "consulting" in the memo line.  Later that same day, sent an email to the CEO of CCS that stated:  "at the airport … Sheriff McCabe is in a good place with us."  McCabe never reported this campaign contribution on his official report.  McCabe lost the election and, in late 2016 after news articles appeared about the federal investigation that led to this criminal case, McCabe announced his resignation as Sheriff.

### B.  Evidence Relating to Conspirator #1 and Company A

The government will also call several witnesses, including Conspirator #1 himself, to testify about the benefits McCabe granted to Conspirator #1 and his company in exchange for

substantial campaign contributions, free catering for McCabe's events, and hundreds of dollars of gift cards and other personal gifts.

The government will introduce evidence showing that Company A entered into an emergency contract for food services management at the Norfolk Jail in or about 1994 and later submitted a proposal to permanently obtain the business in response to an RFP issued by the City of Norfolk in 1995.  Before the contract was awarded, Conspirator #1 was invited by McCabe to come into his office, at which point McCabe told Conspirator #1 to look at something on McCabe's desk before excusing himself from the room.  Lying on McCabe's desk was a copy of another company's bid proposal.  Conspirator #1 reviewed the document used the information contained therein to submit an updated proposal for Company A that undercut the competitor's bid.  Company A was ultimately awarded the contract, which was for a term of one year and gave the Sheriff the sole authority to renew the contract for two additional years.

Upon McCabe's request, Company A regularly catered food for private events at McCabe's home and other campaign events.  Beginning in at least the year 2000, Company A began providing free catering for McCabe's annual golf tournament, including breakfast and dinner, at a cost of approximately $2,000 per event.  On several occasions, Company A also provided free catering for an annual "Big Blue BBQ" at Old Dominion University.  Company A gave thousands of dollars in donations to McCabe's campaigns and Conspirator #1, at McCabe's request, also gave him hundreds of dollars of gift cards to restaurants and stores and also took McCabe as his guest to the NCAA National Football Championship game.

In return for these things of value and campaign contributions, McCabe used his official position to ensure that Company A retained and financially benefitted from their business with the Norfolk Jail.  Among other things, McCabe used the discretion given solely to him in the

17

contract to the repeatedly extend the term of the deal, allowing Company A to avoid re-bidding though a competitive RFP.  McCabe also approved various increases in the funds paid to Company A, including cost of living adjustments and meal rate increases.  Conspirator #1 understood that McCabe would not continue to use Company A if Conspirator #1 did not continue to provide him with personal benefits.  The government will introduce evidence of correspondence between McCabe and Conspirator #1 reflecting their quid pro quo relationship, including an email in which McCabe reminds Conspirator #1 that Company A's contract will soon expire and then asks for donations to his campaign.

### C.  Evidence Relating to Mandatory Disclosures and Campaign Finance Reports

The government plans to call records custodians to provide and explain the significance of annual conflict of interest forms submitted by McCabe as well as his campaign finance reports.

The conflict of interest forms, which are mandatory for elected officials, required McCabe to disclose any individual gifts valued at more than $50 or aggregated gifts from a single entity of more than $100 in value.  Those forms explicitly required McCabe to "account for all business entertainment . . . even if unrelated to your official duties" and only excluded item from a "relative or personal friend" if they were given "for reasons clearly unrelated to your public position."  Though McCabe filed disclosure covering 2010 through the end of 2016, he never listed any of the gifts, tickets, entertainment, or other items of value he received from Conspirator #1, Company A, Boyle, or CCS.

Similarly, McCabe deliberately mis-described, or failed to disclose entirely, expenses using his campaign donations.  At trial, the government will elicit testimony concerning about meals, cash withdrawals, and other personal items paid for using McCabe's campaign account.

Instead of properly disclosing these expenses, however, the campaign finance disclosures reveal that McCabe falsely described the expense or omitted it entirely. For example, the disclosures reflect that McCabe untruthfully described a personal meal at Todd Jurich's bistro as a "sponsor dinner." A $1,500 check—which in truth was cashed to provide an acquaintance with spending money during a trip to a casino in Atlantic City—was falsely characterized as "reimbursement" for "gas [and] admin services." And several purchases made using campaign funds—including a luxury handbag and tanning bed that cost several thousand dollars—are omitted from the disclosures entirely.

### D. Anticipated Testimony Concerning Money Laundering

The government will call several individuals unaffiliated with either Company A or CCS to testify about their role in transferring funds, originally drawn on a $12,500 check from Boyle in April 2016, though various third parties before ultimately being deposited in McCabe's campaign account.

## IV. Evidentiary Basis for Documents and Testimony

Given the volume of evidence likely to be introduced during the upcoming trial, the government believes it may be helpful to the Court to summarize the bases for admissibility of the government's key evidence.

### A. Stipulations

The parties currently are discussing stipulations that will facilitate the presentation of evidence in this case. Given past experience with defense counsel, the government believes that the parties will agree on numerous stipulations relevant to the authenticity and admissibility of records and other facts in this case which expedite the case and negate the need to call as

witnesses numerous document custodians during the trial.  The government will supplement this

trial brief with the filing of the stipulations once the parties reach an agreement.

### B.  Authentication

As a condition precedent to the admission of evidence, the proponent of that evidence

must satisfy the requirements for authentication under Federal Rule of Evidence 901.  The

requirement of authentication "is satisfied by evidence sufficient to support a finding that the

matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  The burden to

authenticate under Rule 901 is "not high – only a *prima facie* showing is required."  *United*

*States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) (citing numerous cases).  That is because

the "factual determination of whether evidence is that which the proponent claims is ultimately

reserved for the jury."  *Id.* (citing *United States v. Branch,* 970 F.2d 1368, 1370 (4th Cir. 1992)).

The most common way to authenticate a piece of evidence is though testimony by a witness with

sufficient knowledge that the matter "is what it is claimed to be."  Fed. R. Evid. 901(b)(1).

Many of documents that the government will seek to introduce will be authenticated through this

method as well as by stipulation.

### C.  Admission Under the Hearsay Rules

Given the number of witnesses expected to testify at trial, the government is providing

the below summary of potential evidentiary issues that may arise during trial involving hearsay.

#### 1.  Statements of Defendant

The government will introduce many statements made by defendant himself, including

emails, texts, and verbal communications made to other witnesses who will testify at trial.  These

statements are admissions of a party opponent and are therefore excluded from the definition of

hearsay under Federal Rule of Evidence 801(d)(2)(A). In addition, when testimony relates to

20

conversations with the defendant, the government may seek to introduce statements of the person

with whom the defendant was speaking in order to "place [the defendant's] responses into

context," *United States v. Wills*, 346 F.3d 476, 490 (4th Cir. 2003), and to make the defendant's

statements "intelligible to the jury and recognizable as admissions," *id.* (quoting *United States v.*

*Lemonakis*, 485 F.2d 941, 948 (D.C. Cir. 1973)).

### 2. Statements of Defendant's Agents and Employees

Additionally, as the Sheriff of Norfolk, the defendant employed and managed deputies

and other staff over the years of the charged *quid pro quo* schemes.  The government will seek to

introduce various statements made by these individuals during their employment.  Whether made

to other employees at the Sheriff's Office, or to individuals outside the organization, such

statements are admissible under Federal Rule of Evidence 801(d)(2)(D), which excludes

statements from the definition of hearsay when they are "made by [an opposing] party's agent or

employee on a matter within the scope of that relationship and while it existed."

Pursuant to Rule 801(d)(2)(D), "an employee's statement can be used against the

employer as an admission so long as it is made during the existence of the relationship and

concerns a matter within his agency or employment."  *Lewis v. CSX Transp., Inc.*, 202 F.R.D.

464 (W.D. Va. May 7, 2001).  Indeed, even "a statement of illegal activity can still be within the

scope of employment and can be admissible under 801(d)(2)(D)."  *United States v. Riley*, 621

F.3d 312, 338 (3d Cir. 2010), as amended (Oct. 21, 2010) (citing *Cline v. Roadway Express, Inc.*,

689 F.2d 481, 488 (4th Cir. 1982)).  Given that the Federal Rules of Evidence do not define the

scope of an agency relationship, courts in this Circuit have occasionally looked to relevant

treatises.  *See, e.g.*, *Quesenberry v. Volvo Grp. N. Am., Inc.*, 267 F.R.D. 475, 483 (W.D. Va.

2010) (stating that "[a]n agent is 'a person authorized by another to act on his account and under

his control'" (quoting Restatement (Second) of Agency § 1 cmt. e (1958))).  In any event, whether an agency relationship exists in any given case is a fact-bound determination.  The key factor is whether the purported principal exercised control over the declarant.  Here, the government expects to admit emails and other documents prepared by numerous employees of the Norfolk Sheriff's Office under the 801(d)(2)(D) exception to the hearsay rules because such statements were made during the existence of that relationship and in regards to matters within their employment.

### 3.  Statements of Co-Conspirators (Rule 801(d)(2)(E))

The government also intends to introduce statements made by defendant's co-conspirators during and in furtherance of the conspiracy. Under Federal Rules of Evidence 801(d)(2)(E), such statements are excluded from the definition of hearsay.

In order to admit co-conspirator statements under Rule 801(d)(2)(E), the government "must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy." United States v. Graham, 711 F.3d 445, 453 (4th Cir. 2013) (quoting United States v. Pratt, 239 F.3d 640, 643 (4th Cir. 2001)). Each of these three factors "must be supported by a preponderance of the evidence." Id. (citing United States v. Blevins, 960 F.2d 1252, 1255 (4th Cir. 1992)). The Fourth Circuit has explained, however, that district courts are not required "to hold a hearing to determine whether a conspiracy exists before admitting statements under the rule." Id. Instead, a reviewing court will affirm a district court's judgment "where the record reveals that the co-conspirator's statements were plainly admissible, whether or not a detailed rationale for admitting the statements had been stated by the trial court." Id. (quoting Blevins, 960 F.2d at 1256).

In support of the admission of coconspirator statements, the government will introduce evidence sufficient to support a finding as to each of the three necessary factors. Importantly, the Fourth Circuit has stated that "[a] statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." United States v. Smith, 441 F.3d 254, 262 (4th Cir. 2006) (quoting United States v. Shores, 33 F.3d 438, 443 (4th Cir. 1994)). In addition, the Fourth Circuit has construed the requirement that the proffered statements be made in support of the conspiracy "so broadly that even casual relationships to the conspiracy suffice to satisfy the exception." Id. (quoting 5 Weinstein's Federal Evidence §§ 801.34[5], 801–89).

Here, the government intends to introduce statements by several conspirators, including defendant Boyle, that were made in support of the ongoing scheme to defraud the citizens of Norfolk of their right to McCabe's honest services through bribery.  Specifically, among other things, the government will offer emails, texts, and verbal statements made by defendant Boyle, and others, in furtherance of McCabe's honest services fraud scheme.

### 4.  Statements of a Deceased Witness (Rule 807)

The government also intends to introduce a statement made by Norman Hughey, who served as an undersheriff in the Norfolk Sheriff's Department from 2003 through 2013, to Paul Ballance about his interactions with McCabe during the 2010 RFP process.  Specifically, after the bids came in, Hughey told McCabe that CCS did not have the lowest bid, and that McCabe then responded "Don't you think you should call [a senior CCS employee] about that?"  Ballance recalls that, in 2010, Hughey told him about this conversation with McCabe and that he refused McCabe's request.  Later, on May 8, 2017, Hughey himself later recounted this same

conversation with McCabe to a federal investigator.  Mr. Hughey died of cancer on August 30, 2019 and is unavailable to testify at trial.

A court may admit hearsay under the residual exception upon finding that: (1) the hearsay has circumstantial guarantees of trustworthiness equivalent to those of the recognized exceptions, (2) it is offered as evidence of a material fact, (3) it is more probative than any other evidence that the proponent can reasonably obtain,  and (4) admitting it will best serve the purposes of the Federal rules of evidence and the interest of justice.  Fed. R. Evid. 807(a).  In examining the circumstantial guarantees of trustworthiness, which have been described as the most important factor, courts look to the total context in which the statements were made.  *United States v. Cunningham*, 761 Fed. Appx. 203, 206 (4th Cir. 2019).  Here, Balance will testify that the conversation in which the statements were made by Hughey occurred in 2010, which is near in time to when the event giving rise to the statements occurred.  There is no indication that Hughey would have a motivation to lie about such events – particularly at the time they occurred.  Further, Ballance can be questioned regarding the circumstances of the statements.  Likewise, the fact that Hughey recounted the same exact conversation with McCabe years later in an interview with federal agents is also indicative of the trustworthiness of the statement.  Accordingly, the government will seek to admit this statement under the residual hearsay exception during the trial.

### D.  Other Relevant Evidence

Rule 402 of the Federal Rules of Evidence provides that "[a]ll relevant evidence is admissible." Federal Rule of Evidence 401 provides "that evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." As the Fourth Circuit has noted, relevance

"typically presents a low barrier to admissibility." *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003) (citing *United States v. Van Metre*, 150 F.3d 339, 349 (4th Cir. 1998)).  To be admissible, evidence need only be "'worth consideration by the jury,' or have a 'plus value.'" *Id.* (quoting *United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997)).

Rules 403 and 404(b) of the Federal Rules of Evidence, of course, limit the admission of evidence that would result in unfair prejudice or constitute proof of prior bad acts.  Rule 403 only bars evidence that would result in "unfair prejudice," defined as "a genuine risk that the emotions of a jury will be excited to irrational behavior, and that the risk is disproportionate to the probative value of the offered evidence." *United States v. Udeozor*, 515 F.3d 260, 264 (4th Cir. 2008); *see also* Fed. R. Evid. 403, advisory committee note (providing that "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one").  Under Federal Rule of Criminal Procedure 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, evidence of other crimes or bad acts may be:

> admissible for other purposes, which include, but are not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mis take or accident. Rule 404(b) is viewed as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition. To be admissible under Rule 404(b), evidence must be (1) relevant to an issue other than character; (2) necessary; and (3) reliable.

*Siegel*, 536 F.3d at 317 (quotations omitted). To be relevant for purposes of Rule 404(b), "evidence need only to have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996) (quotations omitted). Such relevant evidence is considered necessary under Rule 404(b) "if it is an essential

part of the crimes on trial, or where it furnishes part of the context of the crime." Siegel, 536 F.3d at 316. And it is reliable "unless it is so preposterous that it could not be believed by a rational and properly instructed juror." *Id.*

### a. Use of Campaign Donations for Personal Benefit

The government will introduce evidence at trial that McCabe use campaign funds for personal expenses and lied on his campaign finance disclosure report to conceal his actions. Among other specific examples, the government intends to elicit testimony and introduce bank records showing the McCabe instructed deputies to cash campaign checks and give him or other individuals the withdrawn funds for personal expenses. Indeed, at times McCabe himself purchased dinners and luxury goods using his campaign account. The government will also seek to introduce evidence that McCabe took thousands of dollars of cash used to purchase "mulligans" at the annual golf tournament he organized as a political fundraiser and, when confronted about why the money had not been properly deposited, claimed there had been an issue with the exchange of foreign currency during an international trip.

As this Court has already determined, the "campaign contributions themselves are the alleged 'quids'" of the offenses alleged in the indictment and McCabe's efforts to conceal them, and his personal use of the funds, "bear on his alleged intent to defraud and are clearly relevant to and probative of the offenses charged." ECF No. 54. at 37-38. The Court also noted that, even if this type of evidence constituted uncharged conduct, it would be res gestae not subject to Rule 404(b), and even if it were not, would be admissible under Rule 404(b) anyway. *Id.*

### b. Defendant's Finances and Gambling Trips

The government will also introduce evidence during its case-in-chief about the defendant's earnings from his salary as the Norfolk Sheriff's and his expenses and liabilities,

including loans, credit card debt, and frequent gambling.  This evidence, which will include both financial records and testimony by an FBI financial analyst will show that McCabe was routinely overextended and transferred funds between his campaign and his personal banking accounts to cover his expenses and therefore needed the contributions—as well as free meals, entertainment, and other gifts—from Boyle and Conspirator #1 to support his lifestyle and gambling habit.

The evidence that McCabe went to casinos and engaged in gambling is charged conduct that is highly relevant to the bribery scheme.  In fact, as alleged in the indictment, in October 2011, less than a year after McCabe signed a new medical services contract for CCS, Boyle and McCbe flew from Nashville, Tennessee to Phoenix, Arizona.   While there, they spent three days together in Arizona at the Talking Stick Resort and Casino.  ECF No. 1 at ¶ 45.  Likewise, McCabe also used campaign funds to take a friend on another trip to a casino in Atlantic City.  Accordingly, the government submits that such evidence is admissible under Fed. R. Evid. 401 and 402.

Moreover, as the Fourth Circuit has explained, "lavish spending" alone is not "character evidence" covered by Rule 404(b).  S*ee United States v. Cole*, 631 F.3d 146, 155 (4th Cir. 2011).  Similarly, evidence that an individual enjoyed visiting casinos and engaging in legal gambling does not, by itself, raise the suggestion of bad character, let alone rise to the level of other crimes, wrongs, or acts prohibited by Rule 404(b).  Nonetheless, in an abundance of caution, the government is providing the defense with notice of its intent to use this evidence and submits that this evidence is both relevant and essential to proving the defendant's motive and intent.  *See United States v. Siegel*, 536 F.3d 306, 318 (4th Cir. 2008) (holding that "evidence that [the defendant] started gambling . . . and began to steal money to cover her losses" were admissible as evidence of the defendant's motive); *see also United States v. Vaughn*, 815 F. App'x 721, 726

27

(4th Cir. 2020) (noting that "[a]t trial, the government introduced [the defendant politician's] bank and credit card statements, showing that he was in debt."). Such evidence is "clearly probative of [the defendant]'s motive (e.g., wealth accumulation and maintenance)." 631 F.3d at 155. *Id. See also United States v. Poole*, 451 F. App'x 298, 307 (4th Cir. 2011) (holding that "evidence of [the defendant]'s . . . straitened financial circumstance went directly to motive"); *United States v. Abdulwahab*, No. 3:10cr248, 2016 WL 234109, at *7 (E.D. Va. May 3, 2016); *United States v. Shelburne*, No. 2:06CR00023, 2008 WL 474094, at *2-3 (W.D. Va. Feb. 21, 2008 (collecting cases from various courts and finding that evidence of lavish spending could be admitted under Rules 403 and 404(b) "to demonstrate the defendant's motive-greed").

### c. Notice of Potential 404(b) Evidence

The government further intends to present two evidence for which, in an abundance of caution, it is submitting notice pursuant to Federal Rule of Evidence 404(b). As to this evidence, the government believes that it is part of charged conduct, specifically, it is part of conduct charged in Count Ten: a substantive Hobbs Act violation that stated that McCabe used his official position to obtain things of value to which he was not entitled, from numerous individuals, with their consent, under color of official right. ECF No. 1 at 27. The government charged, and disclosed in discovery, numerous examples where McCabe used his official position to demand things of value – not only from Boyle and Conspirator #1, but also from Conspirator #2, another developer, and employees of the Norfolk Sheriff's Office. The government submits that such evidence is intrinsic to this case and is highly relevant evidence of McCabe's intent to deprive the citizens of Norfolk of his honest services. But, alternatively, and out of an abundance of caution, the government submits that such evidence is admissible under Fed. R. of Evid. 404(b).

Among other evidence, the government intends to elicit testimony that:

- During work hours, McCabe directed certain deputies to perform his personal errands—including walking his dogs and picking his child up from school in Virginia Beach.  Also during work hours, McCabe directed a certain deputy to chauffer the wife of a supporter to and from medical appointments and to pick up business associates at the airport.

- After work hours, McCabe directed certain deputies to chauffer him to events in a limo (provided free of cost by Conspirator #2 and another supporter) or a town car.  This deputy drove McCabe on numerous occasions including to restaurants, special events, concerts, and out of state casinos and sporting events.

- McCabe used inmates on work release from the Norfolk City Jail to assist with the setup of his campaign events and to work as dishwashers in restaurants which were partially owned by Conspirator #2 or by other supporters who gave McCabe things of value including, but not limited to, substantial campaign contributions and the use of limos and town cars.

- McCabe provided jobs at the Norfolk Sheriff's Office to family members of politically connected individuals in Norfolk.

- McCabe allowed a campaign contributor to use a boat slip during "HarborFest" that the City of Norfolk had reserved for the Norfolk Sheriff's Office to ensure security for the event.

- McCabe arranged for the Norfolk Sheriff's Office to rent a warehouse owned by a campaign contributor.

- McCabe lived in a newly constructed home built by a wealthy friend who only charged McCabe for the cost of labor and materials.

- McCabe relied upon the monetary value of providing security and other services by employees of the Norfolk Sheriff's Office during athletic events at Old Dominion University to qualify for the purchase of a luxury suite to watch college football games.

- McCabe directed a contributor to give funds to PD – a straw donor – so that McCabe could list PD as contributing to his mayoral campaign.

The United States submits that the above-described evidence of the defendant's abuse of his office constitutes proof of the defendant's involvement in the charged conduct, provides background and context to the crimes charged in the indictment, and will serve to complete the

story for the jury.  For example, several witnesses will testify about being driven to various events by an off-duty deputy of the Norfolk Sheriff's Office, and one witness will explain that the deputy gave her spending money, drawn on McCabe's campaign funds, to use on a trip to a casino in New Jersey.  The above-described evidence is also relevant to show McCabe's intent and plan, in that he used the trappings and resources of his official position as leverage to secure patronage.

Moreover, McCabe's use of another "straw donor" is directly relevant to the conduct charged in Count Eleven of the indictment—about a different $12,500 check deposited into McCabe's account using straw donors—in that it demonstrates McCabe's intent, plan, and powerfully rebuts any argument that the transfer of the $12,500 check to third parties a simple oversight or mistake.

Respectfully Submitted,

RAJ PAREKH
ACTING UNITED STATES ATTORNEY


By:       _____/s/_____
             Melissa E. O'Boyle
             Assistant United States Attorney
             Virginia State Bar No. 47449
             Attorney for the United States
             United States Attorney's Office
             101 West Main Street, Suite 8000
             Norfolk, VA 23510
             Office Number - 757-441-6331
             Facsimile Number - 757-441-6689
             E-Mail Address - melissa.oboyle@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 19, 2021, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to all counsel of record.


By:       <u>/s/</u>

Melissa E. O'Boyle
Assistant United States Attorney
Virginia State Bar No. 47449
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail Address - melissa.oboyle@usdoj.gov